IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**VALERIE ANNE PEPPER,**

      **Plaintiff,**

      vs.                                                                           Civ. No. 14-776 KK

**SOCIAL SECURITY ADMINISTRATION,**
Carolyn W. Colvin, Acting Commissioner,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff's Motion to Remand or Reverse ("Motion"), filed on July 7, 2015. (Doc. 19.) The Commissioner of Social Security ("Commissioner") filed a Response on September 8, 2015 (Doc. 21). Plaintiff did not file a Reply. Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

### I. Standard of Review

Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116,

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to Magistrate Judge Kirtan Khalsa to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 9, 12.)

[2] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision. 20 C.F.R. §§ 404.981, 416.1481. This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To

qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) she is unable to perform her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant cannot show that her impairment meets or equals a Listing, but she proves that she is unable to perform her "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering her residual functional capacity ("RFC"), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

3

development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III. Background and Procedural Record

Plaintiff Valerie Anne Pepper ("Ms. Pepper") was born on October 29, 1965. (Tr. 99, 115.[4]) Ms. Pepper completed four or more years of college in 2008. (Tr. 120.) Ms. Pepper's work history for the past fifteen years included work as an ambulance paramedic. (*Id.*, Tr. 125-33.)

On January 31, 2011, Ms. Pepper filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401. (Tr. 99-102, 115-124.) Ms. Pepper alleged a disability onset date of October 22, 2010, because of blood borne pathogen exposure, posttraumatic stress disorder, and major depression. (Tr. 119.) Ms. Pepper has not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 17.) Ms. Pepper's date of last insured was December 31, 2015.[5] (Tr. 15.)

Ms. Pepper's application was initially denied on April 29, 2011. (Tr. 60, 69-72.) At reconsideration on June 6, 2011, Ms. Pepper reported that her conditions affected her personal hygiene, her ability to complete tasks and maintain her home, and her thought processes.

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on April 30, 2015.

[5] To receive benefits, Ms. Pepper must show she was disabled prior to her date of last insured. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

4

(Tr. 159.) She reported seven months of psychological care and therapy, and that she continued to have memory problems and difficulty completing tasks. (*Id*.) Ms. Pepper's application was denied again at reconsideration on October 3, 2011. (Tr. 61-68, 74-76.) On November 29, 2011, Ms. Pepper requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ conducted a hearing on October 16, 2012. (Tr. 29-59, 77-78.) Ms. Pepper appeared in person at the hearing and was not represented by an attorney or non-attorney.[6] (*Id.*) The ALJ took testimony from Ms. Pepper (Tr. 32-51), from Jonathan Nash, Ms. Pepper's partner (Tr. 51-54), and from an impartial vocational expert ("VE"), Karen Harrison. (Tr. 54-57.)

On January 25, 2013, the ALJ issued an unfavorable decision. (Tr. 12-24.) At step one, she found that Ms. Pepper had not engaged in substantial gainful activity since her alleged onset date. (Tr. 17.) The ALJ therefore proceeded to step two and found that Ms. Pepper suffered from the following severe impairments: "anxiety disorder and affective disorder." (*Id.*) At step three, the ALJ concluded that Ms. Pepper did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18.)

Because she found that Ms. Pepper's impairments did not meet a Listing, the ALJ went on to assess Ms. Pepper's RFC, which is used to evaluate the claim at both step four and step five. 20 C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g). The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations: She can perform simple repetitive tasks involving seldom direct contract [sic] with the general public and that can be accomplished primarily individually, but not tasks tending to patients medically.

---

[6] Ms. Pepper obtained counsel on May 7, 2013, and is represented in this proceeding by Aida Adams. (Tr. 6.)

(Tr. 19.) The ALJ concluded that Ms. Pepper was not able to perform her past relevant work as a paramedic. (Tr. 22.) At step five, the ALJ used the Medical-Vocational Guidelines as a framework to determine that Ms. Pepper was not disabled. (*Id.*) However, to determine the extent to which Ms. Pepper's nonexertional limitations eroded the occupational base of unskilled work at all exertional levels, the ALJ elicited testimony from VE Harrison. (*Id.*) Based on the VE's testimony, and considering Ms. Pepper's age, education, work experience, and residual functional capacity, the ALJ determined there were jobs that existed in significant numbers in the national economy that Ms. Pepper could perform. (Tr. 23-24.)

On June 27, 2014, the Appeals Council issued its decision denying Ms. Pepper's request for review and upholding the ALJ's final decision. (Tr. 1-4.) In reviewing her case, the Appeals Council considered a brief submitted by Aida Adams summarizing the arguments before the Appeals Council. (Tr. 5, 209-16.) On August 27, 2014, Ms. Pepper timely filed the instant action seeking judicial review of the Commissioner's final decision. (Doc. 1.)

### IV. <u>Analysis</u>

Ms. Pepper makes five arguments in support of reversing and remanding her case, as follows:

(1) the ALJ erred at step three in determining that Ms. Pepper does not have an impairment or combination of impairments that meets or medically equals the severity of Listing 12.06 (Anxiety-Related Disorders (posttraumatic stress disorder)); (2) the ALJ's RFC assessment is flawed because she failed to properly evaluate the degree of Ms. Pepper's mental impairments and failed to include a function-by-function assessment of Ms. Pepper's work-related limitations based on her mental impairments; (3) the ALJ's credibility finding is not based on substantial evidence because she failed to properly evaluate the treating physician evidence; (4) the ALJ

failed to advise Ms. Pepper regarding her right to and need for representation; and (5) the ALJ failed to fully develop the record. (Doc. 19 at 1-2.) Because the Court finds grounds to remand as discussed below, the Court does not specifically analyze all of Ms. Pepper's arguments.

### A. Ms. Pepper's Mental Impairments

The circumstances of Ms. Pepper's mental impairments are straightforward. On October 22, 2010, Ms. Pepper worked as an ambulance paramedic and in the course of her job was called to render medical aid to an individual with a self-inflicted gunshot wound. (Tr. 260-61.) Ms. Pepper performed chest compressions on the individual and was exposed to a significant amount of blood, so much blood that her clothing was saturated, including her pant legs. (*Id.*) Ms. Pepper learned after the fact that the individual was HIV positive, and possibly hepatitis positive. (*Id.*) Ms. Pepper had non-intact skin on her legs from having shaved three days prior to the incident and became distraught and anxious after learning this information. (*Id*.)

#### 1. Concentra Medical Center

On that same date, Ms. Pepper presented to Concentra Medical Center in Las Cruces, New Mexico, and saw Joann F. Love, M.D. (Tr. 260-61.) Ms. Pepper reported her exposure to contaminated blood and described becoming distraught and anxious. (*Id.*) Dr. Love assessed Ms. Pepper with exposure to hazardous body fluids and anxiety reaction. (*Id.*) Dr. Love discussed the case with the Center for Disease Control and noted that Combivir[7] was recommended, as well as HBIG.[8] Dr. Love also provided Ms. Pepper with a prescription to present to the Office of the Medical Investigator to obtain labs on the deceased individual's

---

[7] Combivir is an antiviral medication that helps keep the HIV virus from reproducing in the body. http://www.drugs.com/combivir.html.

[8] Hepatitis B immune globulin (HBIG) helps prevent Hepatitis B infection. http://www.drugs.com/ppa/hepatitis-b-immune-globulin-hbig.html.

blood to test for Hepatitis B and C, and to determine the viral load of HIV.  (*Id.*)  Dr. Love instructed Ms. Pepper to return in three days if the hepatitis status of the deceased individual remained unknown.  (*Id.*)

On October 25, 2010, Ms. Pepper returned to Concentra and saw Dr. Love.  (Tr. 257-58.)  Ms. Pepper reported that the Office of the Medical Investigator had discarded the suicide victim's blood.  (*Id.*)  She reported feeling extremely anxious, and stated that she was sweating, and having heart palpitations, difficulty sleeping, nightmares, and flashbacks on cases during her twenty years as a paramedic.  (*Id.*)  Mr. Pepper stated she was frightened and too distracted to return to work.  (*Id.*)  Dr. Love assessed exposure to hazardous body fluids and posttraumatic stress disorder/anxiety.  (*Id.*)  Dr. Love prescribed Xanax[9] and instructed Ms. Pepper to return on October 29, 2010.  (*Id.*)

On October 29, 2010, Ms. Pepper returned to see Dr. Love.  (Tr. 254-55.)  She reported continued heart palpitations, exhaustion, nightmares, flashbacks, and nausea.  (*Id.*)  Dr. Love assessed exposure to hazardous body fluids and post-traumatic stress disorder.  (*Id.*)  Dr. Love noted that Ms. Pepper could return to work without restrictions, and that her care was being transferred to a psychiatrist.  (*Id.*)  Dr. Love instructed Ms. Pepper to return in one week.  (*Id.*)

Ms. Pepper returned to Concentra nine more times over the next six months.  (Tr. 231, 234, 236, 239-40, 242-43, 245-46, 248-49, 251, 316.)  The records noted that Ms. Pepper's posttraumatic stress disorder persisted.  (*Id.*)  She consistently reported being in "adrenal overdrive," being fearful of leaving home, and experiencing heart palpitations, nightmares and flashbacks.  (*Id.*)  On November 5, 2011, Ms. Pepper was referred for psychiatric evaluation; however, she was not scheduled for an appointment until January 14, 2011.  (Tr. 242, 252.)  On

---

[9] Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. http://www.drugs.com/xanax.html.

January 31, 2011, Dr. Ricardo Rubio noted that although Ms. Pepper was not physically incapacitated, she was having serious psychological issues that were being attended to by neuropsychologist Dr. Tom Thompson.  (Tr. 234.)   The records also noted that Ms. Pepper completed a four-week course of Combivir and received two HBIG injections.  (Tr. 238-49, 258.)  As of April 29, 2011, Ms. Pepper was negative for HIV and hepatitis B.  (Tr. 316.)

### 2. Thomas C. Thompson, Ph.D., ABN, FACPN

Ms. Pepper first saw Neuropsychologist Thomas Thompson on January 14, 2011. (Tr. 218-224.)  Dr. Thompson noted that Ms. Pepper presented with a "high level of anxiety, psychological distress and was frequently tearful," and that her thought content was "characterized by obsessional worries." (Tr. 220.)  Ms. Pepper reported nightmares, flashbacks, and hyperarousal.  (*Id.*)   She described that she was depressed and anxious, and that she experienced shortness of breath, rapid heartbeat, and increased irritability.  (*Id.*)  Dr. Thompson administered several standardized psychological tests[10] and diagnosed Ms. Pepper with "Post-Traumatic Stress Disorder" and "Major Depressive Disorder, single episode, continuing." (Tr. 223.)  Dr. Thompson found that

> [t]his was a 45-year-old female with high average to superior intellectual functioning with a presentation of significant PTSD symptoms and major depression.  She has had symptoms now for almost four months.  She evidenced indications of mild difficulties associated with working memory and mental control which were interpreted as consistent with the impact that PTSD has on cognitive and emotional functioning.  She is currently unable to return to her work situation.  Given the twenty-year history of being a paramedic, the current episode is likely to be the straw that essentially broke the camel's back.  I do not see her being able to return to the same profession, an[] opinion also expressed by Dr. Love during our phone consultation.  I anticipate her responding to treatment of the acute PTSD, based on premorbid emotional and cognitive functioning, over a period of perhaps a year with medication and with cognitive behavioral therapy.

---

[10] Dr. Thompson administered the WAIS-IV (Wechsler Adult Intelligence Scale-Fourth Edition), the PAI (Personality Assessment Inventory), the MMPI-2 (Minnesota Multiphasic Personality Inventory-2), and the SNSE (measures neuropsychological deficits).  (Tr. 222.)

> She presents as having good cognitive functioning and should do well being retrained in another area.

(Tr. 223.) Dr. Thompson planned to implement phased psychoparmacological treatment, and based on Ms. Pepper's response to medication, he planned to proceed with a "cognitively oriented approach to therapy." (*Id.*) On that same date, Dr. Thompson wrote a prescription note that Ms. Pepper was "not to return to work at this time." (Tr. 225.)

Although the Administrative Transcript indicates that Ms. Pepper continued treatment with Dr. Thompson for eight months, there are no additional records available for review.[11] (Tr. 22, 159, 193, 234, 418.)

### 3. Psychiatric Review Technique Form – Alvin Smith, Ph.D.

On April 23, 2011, State agency nonexamining medical consultant Alvin Smith, Ph.D., reviewed Ms. Pepper's records and completed a Psychiatric Review Technique Form. (Tr. 298-311.) Dr. Smith determined that although Ms. Pepper's mental impairments of major depressive disorder and posttraumatic stress disorder were severe, they were not expected to last twelve months. (Tr. 298, 310.) Dr. Smith assessed Ms. Pepper as having mild limitations in activities of daily living, moderate limitations in social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 308.)

### 4. Robert Mayfield, Ph.D.

On August 25, 2011, Ms. Pepper presented to Robert Mayfield, Ph.D., of Behavior & Family Therapy Services in Las Cruces, New Mexico. (Tr. 362-370, 420.) The referral note indicated that Ms. Pepper was transitioning her care from Dr. Thompson because he had retired.

---

[11] The Social Security Administration first requested Dr. Thompson's records on February 10, 2011, and received Dr. Thompson's Psychological Evaluation of Ms. Pepper dated January 14, 2011. (Tr. 217, 218-224.) The Administration requested Dr. Thompson's records a second time on June 14, 2011. (Tr. 355.) Notes indicate that Administration personnel made two follow-up phone calls to Dr. Thompson's office to check on the status of the records request. (*Id.*) The Administrative Transcript does not evidence that any additional records were received in response to the second request.

(Tr. 35, 420.)  Ms. Pepper reported ongoing symptoms of anxiety, nightmares, flashbacks, mood swings, and memory loss.  (Tr. 362-70, 418.)  Dr. Mayfield evaluated Ms. Pepper, and noted that he reviewed her case with Dr. Thompson.  (*Id.*)  Dr. Mayfield diagnosed Ms. Pepper with posttraumatic stress disorder and assigned an initial GAF score of 60.[12]  (Tr. 362.)  His treatment plan included

> 1. Continue medications with augments for sleep per PCP consult.
>
> 2. Engage in systematic desensitization around PTSD events and work to develop cognitive coping skills that will allow this pt. to have "break through symptoms."
>
> 3. Use Cognitive Behavior therapy to build new stress coping skills and problem solving skills so that her primary means of handling anxiety is not repression – this to ensure that there are no future stores of anxiety related material to cause another PTSD cascade in the future if her defenses are broken down again.
>
> 4. Provide structured problem solving and vocational intervention in order to help her find a direction for a career that is sustainable and will allow her to re-develop identity components related to being "a good productive person, having a job, you know" so that her self-concept and identity will allow her adequate self-esteem to not feel depressed, and move forward with quality of life.

(Tr. 369.)

The record supports that Ms. Pepper saw Dr. Mayfield sixteen times from September 12, 2011 to April 12, 2012.[13]  (Tr.  272-73, 274, 275-76, 277-78, 279-80, 381, 383-84, 385-86, 387-

---

[12] A GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000). A GAF score of 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* at 34.

[13] Ms. Pepper testified on October 16, 2012, that she was still seeing Dr. Mayfield weekly.  (Tr. 36.)  The Social Security Administration requested Dr. Mayfield's records on October 24, 2012, November 16, 2012, December 3, 2012, and December 18, 2012.  (Tr. 196, 200, 203, 204.)  The records received from Dr. Mayfield on December 18, 2012, were from August 25, 2011, through April 12, 2012.

88, 389-90, 391-92, 393-94, 395-96, 397, 398, 401-02.) Dr. Mayfield noted that Ms. Pepper's posttraumatic stress disorder symptoms persisted. (*Id.*) Over the course of treatment, Dr. Mayfield generally rated Ms. Pepper's GAF score at 60, with a single low outlier of 40, and a single high outlier of 70.[14] (Tr. 379-80, 395-96.) On April 5, 2012, Dr. Mayfield reported to the New Mexico Department of Workforce Solutions that Ms. Pepper was unable to return to her customary work, but was potentially able to perform non-medical jobs. (Tr. 399.) Dr. Mayfield noted, however, that Ms. Pepper's prognosis was poor. (*Id.*)

    **B.**    <u>**RFC Assessment**</u>

Assessing a claimant's residual functional capacity is an administrative determination left solely to the Commissioner. 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (stating that some issues are administrative findings, such as an individual's RFC). In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. § 404.1545(a)(2) and (3). The ALJ must consider and address medical source opinions and must always give good reasons for the weight accorded to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-8p, 1996 WL 374184, at *7. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the

---

[14] A GAF score of 40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed [wo]man avoids friends, neglects family, and is unable to work . . . ); a GAF score of 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household,), but generally functioning pretty well, has some meaningful interpersonal relationships. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000).

opinion was not adopted. SSR 96-8p, 1996 WL 374184 at *7. Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7). When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence. *See Southard v. Barnhart*, 72 Fed. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 Fed. App'x 173, 177-78 (10th Cir. 2003).

### 1. **The ALJ Failed to Properly Evaluate the Treating Physician Opinion Evidence**

Ms. Pepper argues that the ALJ failed to properly evaluate the treating physician opinion evidence.[15] (Doc. 19-1 at 13-15.) Specifically, Ms. Pepper asserts that the ALJ failed to give good reasons for the inconsistent weight she gave Dr. Thompson's opinion, and failed to state what amount of weight, if any, she accorded Dr. Mayfield. (*Id.*) The Commissioner contends that the ALJ sufficiently explained her reasons for both accepting and rejecting Dr. Thompson's opinion, and that the ALJ had no need to state the weight she accorded Dr. Mayfield because he did not provide a specific opinion regarding Ms. Pepper's mental residual functional capacity and because the medical evidence did not conflict with the ALJ's conclusion. (Doc. 21 at 17-18.) The Court does not agree with the Commissioner's contentions.

Regulations require that regardless of the source, all medical opinions must be evaluated and weighed. 20 C.F.R. § 404.1527(c). The weight given to an opinion will vary according to

---

[15] Ms. Pepper asserts that the ALJ erred in her credibility finding because the ALJ failed to properly evaluate the medical opinion evidence; however, the Court incorporates Mr. Pepper's medical opinion argument here to address the ALJ's RFC assessment. (Doc. 19-1 at 13-15.)

the relationship between the disability claimant and the medical professional. *Hamlin*, 365 F.3d at 1215. An ALJ is required to give controlling weight to a treating physician if the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 at 1119 (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). Finally, if the ALJ rejects the opinion completely, she *must* then give "'specific, legitimate reasons'" for doing so. *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).

### a. Dr. Thompson

The ALJ failed to properly evaluate Dr. Thompson's opinion. Here, Dr. Thompson initially evaluated Ms. Pepper on January 14, 2011, and treated her posttraumatic stress disorder for eight months before he transferred her care to Dr. Mayfield.[16] (Tr. 22, 159, 193, 234, 418.) Relying solely on Dr. Thompson's initial evaluation, the ALJ gave substantial weight to Dr. Thompson's conclusion that Ms. Pepper could not return to her past profession, but rejected his conclusion that she could not return to work at this time. (Tr. 22.) The ALJ's evaluation is improper for two reasons. First, "[t]he ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Robinson v.*

---

[16] The Court acknowledges that Ms. Pepper had an ongoing treatment relationship with Dr. Thompson. However, the only record available for the ALJ's review was Dr. Thompson's Psychological Evaluation from January 14, 2011, despite a second records request and two follow-up phone calls. (Tr. 355.)

*Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). Second, the ALJ's explanation for rejecting part of Dr. Thompson's opinion was not based on contradictory medical evidence.

"In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Robinson*, 366 F.3d at 1082 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)). Here, the ALJ improperly rejected Dr. Thompson's opinion in two ways. First, the ALJ explained that Ms. Pepper's superior intellectual functioning was inconsistent with Dr. Thompson's opinion and presumably could not have rendered her unable to return to work at that time. (Tr. 22.) However, Dr. Thompson rendered his opinion in spite of his finding that Ms. Pepper had superior intellectual functioning. As such, the ALJ made her own speculative inference from Dr. Thompson's findings, and in so doing substituted her own judgment for Dr. Thompson's, which is also improper. "An ALJ may not substitute [her] own opinion for that of a claimant's doctor." *Miller v. Chater*, 99 F.3d 972, 977 (10th Cir. 1996) (citations omitted).

Second, the ALJ explained that Ms. Pepper's pursuits to complete her MBA and to secure unpaid work opportunities, even after her traumatic event, were also inconsistent with Dr. Thompson's opinion regarding her ability to return to work at that time. (Tr. 22.) It is improper to use credibility findings as a basis for rejecting a treating physician's opinion. Moreover, the ALJ's credibility findings are not supported by substantial evidence. Ms. Pepper reported to Dr. Mayfield on August 25, 2011, that she had *goals* of completing her MBA, becoming a Master Gardener, and pursuing a paid internship at the Smithsonian Garden. (Tr. 365.) However, on September 12, 2011, Ms. Pepper reported to Dr. Mayfield that she had

difficulty going to class and that she had dropped the horticulture class. (Tr. 372.) On October 8, 2011, Ms. Pepper reported to Dr. Mayfield that she was on academic probation. (Tr. 375.) At the administrative hearing on October 16, 2012, Ms. Pepper testified she had not completed her MBA. (Tr. 38.) Ms. Pepper also testified at the hearing that her attempt to do volunteer work at the "State Park" and "at a farm" had been unsuccessful. (Tr. 40.) Thus, the record does not support that Ms. Pepper achieved these goals despite her aspirations to do so. For these reasons, the ALJ's reliance on these credibility findings to explain her rejection of Dr. Thompson's conclusion is both improper and not supported by substantial evidence.

### b. Dr. Mayfield

The ALJ failed to properly evaluate Dr. Mayfield's opinion. It is undisputable that Dr. Mayfield was one of Ms. Pepper's treating physicians.[17] Dr. Mayfield began treating Ms. Pepper's posttraumatic stress disorder on August 25, 2011, and the administrative transcript contains Dr. Mayfield's records through April 12, 2012.[18] (Tr. 362-70, 372-381, 383-98, 401-402.) "Under the regulations, the agency rulings, and our case law, an ALJ *must* give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (emphasis added). Thus, the ALJ was *required* to assign weight to Dr. Mayfield's opinion and to provide the reason for the weight assigned. The ALJ did not do that here. As such, the Commissioner's arguments that the

---

[17] To be a treating physician requires a relationship of both duration and frequency. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and [her] maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Id.* (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). "A longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits." *Doyal*, 331 F.3d at 762-63.

[18] *See* fn. 14, *supra*.

ALJ had no need to state the weight she accorded Dr. Mayfield because he did not provide a specific opinion regarding Ms. Pepper's mental residual functional capacity and because the medical evidence did not conflict with the ALJ's conclusion necessarily fail because the requirement to do so is mandatory. Moreover, the ALJ did not offer these explanations for not weighing Dr. Mayfield's opinion, and the Court will not adopt the Commissioner's post-hoc rationalization for the ALJ's lack of findings that are not apparent from the ALJ's decision itself. *Watkins*, 350 F.3d at 1301; *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (finding the court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself). Here, the ALJ failed to assign weight to Dr. Mayfield's opinion, and failed to provide any reasons to explain her consideration and/or rejection of his opinion. Absent these findings, the Court cannot simply presume the ALJ applied the correct legal standard in considering Dr. Mayfield's opinion.

For the foregoing reasons, the ALJ failed to apply the correct legal standards in evaluating Dr. Thompson's and Dr. Mayfield's opinions. This is reversible error. The "failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen*, 436 F.3d at 1165.

### 2.  The ALJ Failed to Develop the Record as to Ms. Pepper's Vocational Rehabilitation Records

The RFC assessment must be based on *all* of the relevant evidence in the case record. SSR 96-8p, at *5, 1996 WL 374184 (emphasis in original). Ms. Pepper testified at the administrative hearing that she was receiving assistance from the Department of Vocational Rehabilitation in Las Cruces. (Tr. 48.) Ms. Pepper testified that she believed the ALJ's review of those records was necessary before the ALJ made her decision. (*Id.*) The ALJ stated on the

record that the vocational records would be requested. (Tr. 49.) However, there are no records from the Department of Vocational Rehabilitation in Las Cruces in the Administrative Transcript, nor is there evidence that the records were ever requested. A social security disability hearing is a nonadversarial proceeding, and the ALJ is "responsible in every case 'to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.'" *Madrid*, 447 F.3d at 790 (internal citations omitted). Generally this means that the "ALJ has the duty to . . . obtain[] pertinent, available medical records which come to [her] attention during the course of the hearing." *Id.*, 447 F.3d at 790 (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)). Moreover, the ALJ's "duty is heightened" when a claimant, like Ms. Pepper, appears before the ALJ without counsel. *Id.* (quoting *Henrie*, 13 F.3d at 361.) Here, the ALJ failed to fully develop the record by failing to request the records from the Department of Vocational Rehabilitation. This is reversible error.

    **C.**    **Remaining Issues.**

The Court will not address Ms. Pepper's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### V. Conclusion

For the reasons stated above, Ms. Pepper's Motion to Remand or Reverse (Doc. 19) is **GRANTED.** This matter is remanded for further proceedings consistent with the Court's findings.

                                                             _____
                                                              **KIRTAN KHALSA**
                                                              **United States Magistrate Judge,**
                                                              **Presiding by Consent**